**CERTIFIED BLOOD DONOR SERVICES, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 74–31.**

United States Court of Customs and Patent Appeals.

March 6, 1975.

Gail T. Cumins, New York City (Sharretts, Paley, & Carter, New York City), attys. of record, for appellant. Eugene F. Blauvelt, New York City, of counsel.

Carla A. Hills, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section,

Frank J. Desiderio, New York City, for United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This is an appeal from the judgment of the United States Customs Court[1] overruling appellant's complaint against the classification of certain diagnostic serums as an "article, not provided for elsewhere," under item 799.00 of the Tariff Schedules of the United States (TSUS), and rejecting appellant's claim that the imported serums are "therapeutic serums," "antitoxins," or "analogous biological products" under item 437.76, TSUS. We reverse.

### The Statutes

The protested classification is:

Schedule 7. Part 14.—Nonenumerated Products

Any article, not provided for elsewhere in these schedules:
    Which is similar in the use to which it may be applied to any article or articles enumerated in any of the foregoing provisions of these schedules as chargeable with duty:
        \*     \*     \*     \*     \*     \*
799.00  Other ...................... 9% ad val.

The claimed classification is:

Schedule 4. Part 3.—Drugs and Related Products
  \*     \*     \*     \*     \*     \*
437.76  Viruses, therapeutic serums, vaccines, toxins, antitoxins, and analogous biological products; human blood and fractions thereof, human skin and bone grafts, and other anatomical parts of the human body prepared for diagnostic or therapeutic purposes ........................ Free

### The Imported Merchandise

The merchandise, imported in 1968, was invoiced by the West German manufacturer (Behringwerke AG) as follows:

    Anti-Gamma-M-Glob. Serum from rabbit.
    Anti-Gamma-G-Glob. Serum from rabbit.
    Anti-Gamma-A-Glob. Serum from rabbit.

The testimony of the sole expert witness, Stephan E. Ritzmann, M.D., established that the imported serums (also known as antisera) are manufactured in the following manner. The first step is to isolate and purify a certain protein (called an immunoglobulin) in a blood sample from a human having a blood disorder called monoclonal gammopathy. Dr. Ritzmann characterized this disorder as a type of cancer involving a proliferation of the blood cells which produce immunoglobulins. He further stated that there are five specific types of immunoglobulins: IgA, IgG, IgM, IgD, and IgE, respectively. It is apparent that the imported serums, as denominated on the invoice, correspond to three of the five immunoglobulin types.

The second step is to inject one immunoglobulin into a normal rabbit. The rabbit's body responds by producing antibodies which are specific to the injected immunoglobulin. After a certain latent period, the rabbit's blood is drawn and examined for the presence and potency of antibodies directed against the immunoglobulin. If the potency and specificity are satisfactory, then large amounts of blood are drawn and processed. The processing consists essentially of separating the red cells from the slightly yellow fluid, referred to as serum, which contains the antibodies. The serum is packaged in vials and, in this form, is imported.

Dr. Ritzmann also testified how the imported serums are used as diagnostic reagents. They are employed in immunoelectrophoresis (IEP), which is the method of choice for the diagnosis and differential diagnosis of monoclonal gammopathy. According to Dr. Ritzmann, IEP analysis proceeds as follows: first, a serum sample from a patient is placed on a plastic slide coated with agarose; second, this serum sample is electrophoresized, that is, subjected to an electric current which results in the migration into various positions of the immunoglobulins in the serum; third, one of the imported diagnostic serums is add-

1.  72 Cust.Ct. 98, C.D. 4509, 377 F.Supp. 964 (1974).

ed to the plastic slide; and finally, if there is an antigen-antibody reaction between an abnormal immunoglobulin from the patient and the antibodies in the imported diagnostic serum, a precipitin line will appear on the slide, thus indicating a specific type of monoclonal gammopathy. For example, referring to plaintiff's Exhibit 2 (an IEP slide), Dr. Ritzmann testified that certain arcuate lines therein reflected the presence of an abnormal IgG type of immunoglobulin and thus indicated this type of monoclonal gammopathy in the patient. The type of medical therapy for a patient will be dependent upon the type of monoclonal gammopathy diagnosed.

### The Oral Stipulation

At the trial, counsel for the parties orally stipulated as follows: (Bracketed matter and emphasis ours.)

[Defendant's counsel]: Your Honor, as part of Government's opening statement, I offer to stipulate with plaintiff that the *subject merchandise* at the time of importation did not have a license issued to *it* under the provisions of the Public Health Service Act, 42 U.S.C. Section 262.[2]

[Plaintiff's counsel]: Nor was one required. Would you add that, and I will stipulate?

[Defendant's counsel]: Nor was one required, as added by plaintiff's counsel.

[Plaintiff's counsel]: I so stipulate.

In the opinion of the Customs Court, the oral stipulation is referred to as follows:

Furthermore, in determining whether the imported antisera fall within the purview of item 437.76, it is a relevant consideration that at the time of importation of the antisera no license was issued or required by the Secretary of Health, Education, and Welfare pursuant to 42 U.S.C. § 262, as stipulated by the parties.

Appellant (plaintiff below) makes the following statement in its brief on appeal:

Counsel for appellant, after the decision was published, learned for the first time that Behringwerke, A. G., the establishment producing the imported diagnostic serums did possess an Establishment License No. 97 under the Public Health Service Act of July 1, 1944. Of course the existence of this Establishment License was not proved at the trial and is not subject to judicial notice.

### Legislative History

The opinion of the Customs Court contains the following passage regarding the legislative history of item 437.76, TSUS (Bracketed matter and emphasis by the Customs Court):

As an aid to interpreting item 437.-76, TSUS, defendant cites the Tariff Classification Study Explanatory and Background Materials, November 15,

---

2. At the time of importation in 1968, 42 U.S.C. 262(a) (1964) provided:

§ 262. Regulation of biological products. Intrastate and interstate traffic; suspension or revocation of license as affecting prior sales.

(a) No person shall sell, barter, or exchange, or offer for sale, barter, or exchange in the District of Columbia, or send, or carry, or bring for sale, barter, or exchange from any State or possession into any other State or possession or into any foreign country, or from any foreign country into any State or possession, any virus, therapeutic serum, toxin, antitoxin, or anal-

ogous product, or arsphenamine or its derivatives (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of diseases or injuries of man, unless (1) such virus, serum, toxin, antitoxin, or other product has been propagated or manufactured and prepared *at an establishment holding an unsuspended and unrevoked license,* issued by the Secretary as hereinafter authorized, to propagate or manufacture, and prepare such virus, serum, toxin, antitoxin, or other product for sale in the District of Columbia, or for sending, bringing, or carrying from place to place aforesaid; * * *. [Emphasis ours.]

1960,[2] Schedule 4, part 3, p. 86, which states:

[2] The Tariff Classification Study, published by the United States Tariff Commission pursuant to Congressional delegation (Customs Simplification Act of 1954, Public Law 83–768, 68 Stat. 1136) is regarded by the courts as a source of legislative history of the TSUS. See Rifkin Textiles Corp. v. United States, 54 CCPA 138, C.A.D. 925 (1967).

\* \* \* Also, the provisions of items 437.44 through 437.52, as published, relating to biologicals provided for in paragraph 1610 have been consolidated and enlarged in scope in final proposed item 437.76 to do away with certain artificial distinctions now involved and thereby make a more coherent group of related articles which *substantially correspond with the scope of the licensing requirements of the Public Health Service and the Department of Agriculture applicable to the importation of certain biological products.* Human blood and fractions there of [sic] and anatomical parts of the human body have been specifically added to the new provision. The rate changes involved in item 437.76 are unimportant. [Emphasis added.]

\* \* \* \* \* \*

### The Decision Below

In essence, the Customs Court held that the imported serums are not "therapeutic serums" or "antitoxins" under item 437.76 because they are used only as in vitro diagnostic aids and are not intended for internal administration in patients for immunological, therapeutic, or prophylactic purposes. The Customs Court further held that the imported serums are not "analogous biological products" under item 437.76 because they are not analogous to "therapeutic serums" or "antitoxins" for the same reasons.

### OPINION

The issue is whether the imported serums should be classified as "therapeutic serums," "antitoxins," or "analogous biological products" under item 437.76, TSUS. We hold that they should be classified as "analogous biological products."

The legislative history, seen in the passage quoted above from the Tariff Classification Study (1960), is dispositive of the issue. That passage clearly demonstrates that the scope of item 437.76 was intended to "substantially correspond with the scope of the licensing requirements of the Public Health Service . . . applicable to the importation of certain biological products."

The aforesaid Public Health Service licensing regulations, as they existed in 1960 (at the time of the Tariff Classification Study), are in Part 73, "Biologic Products," of Title 42, Code of Federal Regulations (1960). The regulations had been in existence prior to 1960. Minor changes in the regulations occurred from time to time, but insofar as this appeal is concerned, their substance was unchanged from at least 1956 to 1968.

The definitions found in 42 C.F.R. § 73.1 (1960) are pertinent:

§ 73.1 Definitions.

As used in this part:

\* \* \* \* \* \*

(g) "Biologic product" means any virus, therapeutic serum, toxin, antitoxin, or analogous product applicable to the prevention, treatment or cure of diseases or injuries of man:

\* \* \* \* \* \*

(2) A therapeutic serum is the product obtained from the blood of an animal by removing the clot or clot components and the blood cells and intended for administration by a route other than ingestion.

\* \* \* \* \* \*

(4) An antitoxin is a product containing the soluble substance in serum or other body fluid of an immunized animal which specifically neutralizes the toxin against which the animal is immune.

(5) A product is analogous:

\* \* \* \* \* \*

(ii) To a therapeutic serum, if composed of whole blood or plasma or containing some organic constituent or product other than a hormone or an amino acid, derived from whole blood, plasma, or serum and intended for administration by a route other than ingestion.

(iii) To a toxin or antitoxin, if intended, irrespective of its source of origin, for the prevention, treatment, or cure of diseases or injuries of man through specific immunization.

\*   \*   \*   \*   \*   \*

(i) "Products" includes biologic products and trivalent organic arsenicals. A product is deemed "applicable to the prevention, treatment or cure of diseases or injuries of man" irrespective of the mode of administration or application recommended, including use when intended, through administration or application to a person, as an aid in diagnosis or in evaluating the degree of susceptibility or immunity possessed by a person, and including also any other use for purposes of diagnosis if the diagnostic substance so used is prepared from or with the aid of a biologic product.

◼ These Public Health Service regulations broadly define the phrase "applicable to the prevention, treatment or cure of diseases or injuries of man" as "including also any other use for purposes of diagnosis if the diagnostic substance so used is prepared from or with the aid of a biologic product." The imported serums are "obtained from the blood of an animal by removing . . . the blood cells," they contain "the soluble substance . . . which specifically neutralizes the toxin against which the animal is immune," and they are "applicable to the prevention, treatment or cure of diseases or injuries of man" because they are used "for purposes of diagnosis." Hence, the instant diagnostic serums are "analogous biologic products" as defined in the 1960 Public Health Service regulations. Therefore, the proper classification of the imported merchandise is item 437.76, TSUS ("analogous biological products").

The oral stipulation of the parties states that the *subject merchandise* at the time of importation did not have a license issued to *it* under the provisions of 42 U.S.C. 262 (1964) (see note 2, supra) nor was one required. Appellant contends that the stipulation is not relevant since the cited section provides only for the licensing of establishments. Appellee admits that this view of the section is accurate, but contends that the inference to be drawn from the stipulation is that the merchandise at bar was not one of those products which would require its manufacturer to be licensed. We have considered this precisely worded oral stipulation, but find that it is of no probative value since 42 U.S.C. 262(a) (1964) speaks of "an establishment holding an unsuspended and unrevoked license."

◼ Furthermore, we have given no consideration to the statement in appellant's brief that the West German manufacturer (Behringwerke AG.) did possess an establishment license under the Public Health Service Act since, as appellant recognizes, this is a fact which should have been proved by evidence presented to the Customs Court.

The judgment is reversed.