AMACO, INC. *v.* UNITED STATES

(Decided June 25, 1975)

*Schwartz & Lidstrom* (*Earl R. Lidstrom* of counsel); *Barnes, Richardson & Colburn* (*Peter J. Fitch* of counsel); for the plaintiff.
*Rex E. Lee,* Assistant Attorney General (*Gilbert Lee Sandler,* trial attorney), for the defendant.

LANDIS, Judge: This action involves the tariff classification of a "Strunck Ampoule Inspection Unite, Type ADG 500", imported from West Germany and entered at Philadelphia in 1967. The record establishes that the unit is used by pharmaceutical manufacturers to inspect and check ampoules that are small bulbous glass vessels hermetically sealed to hold a solution for hypodermic injection under the skin.

Customs officials assessed the imported unit at 50 per centum ad valorem under the TSUS (Tariff Schedules of the United States) item 710.90 classification as follows:

|  | Optical measuring or checking instruments and appliances not provided for elsewhere in subpart C, D, or F of this part, and parts thereof: | |
|---|---|---|
| * * * | Profile projectors and parts thereof_ | * * * |
| * * * | Comparator, comparator benches, measuring benches, and micrometric reading apparatus, all the foregoing and parts thereof_____ | * * * |
| 710.90 | Other_____ | 50% ad val. |

Plaintiff claims that for tariff purposes the inspection unit is not an optical checking instrument or appliance and is properly classifiable under TSUS item 678.50 as a machine not specially provided for, dutiable at only 10 per centum ad valorem.

The TSUS item 710.90 under which classification was made by customs is conceded by plaintiff to be more specific than the TSUS item 678.50 under which classification is claimed. Where two possible classifications apply to an imported article, the proper classification is under the provision which describes the item most specifically (TSUS, General Headnotes and Rules of Interpretation 10(c)). For purposes of classification under item 710.90, plaintiff also concedes that the inspection performed by the imported unit is a checking function. The issue joined and briefed by both sides is whether the

imported unit is "optical", in the sense that TSUS classifies optical checking instruments and appliances in schedule 7, part 2, subpart C, item 710.90. Relevant to that issue schedule 7, part 2, provides that as a matter of law:

Part 2 headnotes:

\*      \*      \*      \*      \*      \*      \*

3. The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.[1]

In the context of the term "optical instruments", customs is presumed to have found each and every fact necessary to support the classification of the imported unit as an optical checking instrument under item 710.90. Cf. *Chas. Kurz Co.* v. *United States*, 57 Cust. Ct. 90, C.D. 2735 (1966). The parties have stipulated that the imported unit does, as a matter of fact, incorporate an optical element, to wit, "a lens with a magnifying power of 1:2.5". Upon weighing the material documentary and testimonial evidence next discussed, I conclude that plaintiff has failed to overcome the presumption that the optical element is not incorporated in the imported unit "solely for viewing a scale or for some other subsidiary purpose." [2]

For the record, the parties have stipulated the following facts:

1. The physical features, and method of operation, of the subject imported "Strunck Ampoule Inspection Unite, Type ADG 500" (which is the same in all material respects as the "Model KVL A 05," and which is hereafter referred to as the "ADG 500") are accurately described in the materials annexed to the instant stipulation, and made a part hereof [identified as Collective Exhibit D(1) through D(7)]. Said materials are a part of the "Operating Instructions" prepared by the manufacturer (H. Strunck & Co.) and supplied to the ultimate purchaser of the subject ADG 500 at the time of its purchase.

---

[1] The report submitted to the House and Senate Committees on TSUS advised that "Headnote 3 * * * [is] a definition of the term 'optical instruments'." Tariff Classification Study, Schedule 7, page 140.

[2] The Tariff Classification Study, Schedule 7, critiques the classification of items 710.86 through 710.90 as follows:

* * * The third superior heading in this subpart would provide for "optical measuring or checking instruments and appliances not provided for elsewhere in subpart C, D, or F of this part". These three items (which were included in subpart D of this part in the draft published for public hearings) embrace a number of optical instruments used for measuring and checking materials and products in laboratories, machine shops, inspection stations and the like. Such instruments would include profile projectors used for checking the shape and dimensions of machined articles, optical comparators, comparator and measuring benches, interferometers, optical surface testers, alignment telescopes, micrometric reading apparatus and similar instruments. The instruments included in these categories all incorporate optical devices of various types, but instruments whose only optical element consists of a magnifying device for reading scales or for carrying out adjustments are not included (see headnote 3 of this part). * * *
[Page 150.]

2. The ADG 500, in its imported condition, included a "lens hood" or "lens case" (hereafter referred to as the "case") which incorporated a lens with a magnifying power of 1:2.5.

3. In addition to the semi-circular light-deflecting hood [which is visible on the front of the case, as shown in Collective Exhibit D(6)], the back of the case included a metal "hood" which (a) consists of four metal plates, joined at right angles and attached to the back of the case, (b) tapers down in size as it extends back from the perimeter of the lens to the inspection station, giving the appearance of a megaphone, closed off by the lens at the large end, opened at the rectangularly-shaped smaller end, and with squared-off edges running its length, and (c) serves the purpose of deflecting stray light that might otherwise enter the area between the inspection station and lens. Said "hood" must first be unscrewed from the rest of the case in order to remove the lens from the case.

4. The lens case (including the "hood" described in paragraph 3, *supra*), was designed so that it may be swung open on the hinges which are on its left side and which affix the case to the ADG 500, but the case can be physically removed and detached from the ADG 500 only by unscrewing the hinges.

5. A high intensity bulb, located within the ADG 500 beneath the inspection station, serves as the source of illumination of the ampoules and their contents while being inspected in the inspection station.

6. A total of two ADG 500's were imported by plaintiff and those are the only two, to the knowledge of the parties, to have ever been imported into the United States. Both ADG 500's were imported with their own lenses and lens cases; both have been in continuous use for ampoule inspection since shortly after their importations; and in such use, both have always been operated by inspecting the ampoules and their contents through the magnifying lens.

Collective exhibit D(1), referred to in the stipulation, is entitled "Operating Instruction ADG 500." It describes the imported unit's "Method of Operation" as follows:

Method of Operation and Description

With this machine a visual control of the contents of the ampoules can be effected in order to detect foreign particles.

5 ampoules are transported out of the magazine by a transport worm into the inspection station.

The 5 ampoules are elevated, set into rotation, and after this brought to standstill.

After the sudden stopping the contents of the ampoules is still spinning so that any foreign particles like dust particles or glass splinters can [be] easily detected through the lens with a magnifying power of 1:2.5. Charrings of the ampoule top and hairline cracks can be detected as well.

It is possible to repeat the spinning by pressing the repetition button.

The ampoule considered as bad is released by pressing a button and is eliminated into a container.

The ampoules considered as good are lowered, transported out of the inspection station and sorted into a receiver.

The time of inspection, e.g. the time between stopping and lowering of the ampoules can be regulated by a timing relay.

The only witness who appeared and testified in this case is Mr. Gerard Ziffer, president of Amaco, Inc.—plaintiff. Much of what he testified to is relevantly covered by the stipulated facts. Mr. Ziffer additionally testified that he first saw the imported unit many years ago. In his words, it represented "one of the first devices which made it easier for the operator to inspect ampoules. Up to that time, ampoules, glassware of any type in the pharmaceutical industry were [usually] manually inspected." He affirmed that a manual inspection "took place after the inspector shook the ampoule." He elaborated that in a manual inspection the inspectors merely "gather ampoules, usually physically, or manually, into their hand and look at them, checking them." The inspector, he said, visually checks for "particles which may float about inside [the ampoule], just the same as you check a bottle to see if there is any sediment. If there is any sediment in the bottle it will rise and, if there are any impurities, they will reject the ampoules, put it down again, and pick up another lot."

Relevant to the imported unit, Mr. Ziffer testified that it requires an operator and that the prime function of the unit "is an aid to the determination of the presence or absence of impurities within the glass containers." Asked if an optical element is involved in the operation of the unit, Mr. Ziffer first stated that he did not understand the question. When counsel clarified that Mr. Ziffer had "given the Court a description of the operation from the entry of the ampoule into the device to the inspection and either the passing or rejecting of the ampoule"[3] and counsel wanted to know if Mr. Ziffer had indicated in that operation the use of any optical elements, Mr. Ziffer replied: "No, I haven't but—" at which point counsel interrupted to ask if the described operation was "complete and adequate to perform the function of inspecting ampoules for impurities" to which Mr. Ziffer answered "Yes". Asked if an optical element is ever "used in the operation" of the imported unit, Mr. Ziffer answered "Yes" and stated that the optical element "can be" part of the unit but is not a necessary function of the unit. He testified that the optical lens is

---

[3] Mr. Ziffer's description of the operation was not substantially different from the stipulated "Method of Operation" quoted in the opinion, *supra*.

attached to a hood which shields out extraneous light during the inspection and stated that the hood is also not necessary to the operation of the unit. When asked the purpose or function of the lens, Mr. Ziffer stated that the unit "can be used without the lens or without anything in front of the operator. We discourage it." What the lens does according to Mr. Ziffer is make it easier for the operator to see [the ampoule under inspection] and the lens acts as a safety device against flying glass should an ampoule break during the spinning phase at fairly high speed incident to the inspection. When that happens the glass flies all over the place and this could be injurious to the operator. If there was no lens there, the operator would either have to wear safety glasses or any other device, a shield would have to be put in there. "We can", he said, "instead of the lens, also provide a glass shield as a safety device." Mr. Ziffer also testified that the lens is not imported with the unit but said the lens "could have been imported * * * with the first machine which might have been at the special request of the customer." (Paragraph 6 of the stipulation quoted, *supra*, however, recites facts directly contrary.)

In concluding his direct testimony, Mr. Ziffer testified that the function and purpose of the imported unit is as "an aid to the determination of the presence or absence of impurities within the glass containers" and stated that said function is accomplished without the use of the optical lens.

On cross-examination, Mr. Ziffer was asked if the imported unit increased the "productivity" of inspection to which he replied that the imported unit itself "does very little except it is an additional aid for the person who inspects." The quality of the inspection, he said, depends on that person and the productivity would, of course, be one hundred percent greater with the machine than it would be if the inspection was done "manually". Mr. Ziffer further stated that the imported unit incorporates a bulb designed to throw light through the ampoules to help illuminate the liquid solution in the ampoules under inspection; that inspection with the imported unit is carried out in a "darkened" or "dimmed" room to make it easier for the operator to view the ampoules; and that the optical lens enlarges the ampoules which makes it easier for the operator to inspect them. The spinning phase of the inspection process with the imported unit, Mr. Ziffer stated, precedes the visual examination of the five ampoules viewed through the optical lens. Mr. Ziffer stated that the imported unit is never sold without the optical lens and the unit is intended to be used with the optical lens although "they don't have to" because, in his not one hundred percent certain recollection, the hood to which the lens is attached is removable from the unit.

Under title "Summary of Argument" in its brief, plaintiff has stated its position with respect to the classification of the imported unit as follows:

> Even though imported with a hood containing an optical element (lens with magnifying power of 1:2.5), the imported article is not an "optical" instrument within the scope of item 710.90. The imported machine is obviously intended to assist an operator to inspect ampoules visually by mechanically agitating the contents in a certain manner and placing possible impurities in a position in which they can be seen. However, this is not done by means of optics.

> The only optical element ever present during the operation of the machine is a lens having a magnifying power of 1:2.5. That lens is not necessary to the operation of the machine and should not control the classification of the machine. The aid provided by the lens is incidental to the function of the machine.

> The lens does not meet the judicially established criteria to control classification.

What plaintiff noticeably has not cited or discussed is the statutory headnote that says the term "optical instruments" embraces instruments which incorporate at least one optical element that is not for viewing a scale or for some other subsidiary purpose. The statute cannot be ignored. The testimonial evidence does not creditably support plaintiff's contention that the imported article is not an optical instrument within the scope of TSUS item 710.90.

Mr. Ziffer's testimony, suggesting that the imported unit is imported without the optical element and that the imported unit performs the checking function as intended without the optical element, simply does not square with the testimony of the witness that the lens makes it easier to see the ampoule under inspection and acts as a safety device from flying glass which could be injurious to the operator and that if there was no lens the operator would have to wear safety glasses or a shield would have to be put in there. Nor does it square with what the parties have stipulated, namely, that only two units have been imported, both with "their own lenses " and both "always * * * operated by inspecting the ampoules and their contents through the magnifying lens."

What plaintiff has done is to marshal the facts into an argument that separates the mechanical parts of the imported unit from the optical element in the checking function. While the imported unit will undoubtedly mechanically operate without the optical element, the checking function cannot, or at least there is no proof that it is, completed by the operator without the assistance of the incorporated optical element or a substitute device.

The overall purpose of the imported article, as plaintiff concedes, is to assist the operator in a "checking" function. *Cf. Bruce Duncan Co., Inc.* v. *United States,* 67 Cust. Ct. 430, C.D. 4312 (1971). Whether the lens does or does not meet certain "judicially established criteria", referred to by plaintiff for classification of an optical instrument under tariff acts earlier than TSUS, is not the issue in this case. The issue is whether the imported article is an "optical instrument", *cf. United States* v. *Bliss & Co.,* 6 Ct. Cust. Appls. 433, T.D. 35980 (1915), as defined in TSUS. Plaintiff has not addressed itself to that issue. At the close of plaintiff's case defendant moved to dismiss and ruling was reserved. Defendant did not renew the motion at the close of its own case and has not argued the motion in its brief. The parties now seek a judgment on the merits and consideration of the motion is moot. On the record and argument in this case, I hold that plaintiff has not overcome the presumption that the imported article is an "optical instrument" as defined in TSUS. *Cf. United States* v. *John V. Carr & Son, Inc.,* 61 CCPA 41, C.A.D. 1116, 495 F. 2d 771 (1974).

The imported checking unit concededly incorporates an optical element. Presumptively the optical element is incorporated for a purpose that is not subsidiary to the checking function. Plaintiff's reliance on what the manufacturer's literature does not say is at best of marginal weight to the classification in this case. The literature does not state that the optical lens must be used with the imported unit. Mr. Ziffer's testimony, unreliable in the several respects earlier noted, nevertheless, is to the effect that either the lens or a substitute device must be used for safety reasons and that the purpose of the lens is to protect the operator from flying glass should an ampoule break in the spinning. Moreover, the literature does say that the imported unit offers "a visual control of the contents of the ampoules * * * in order to detect foreign particles."

The action is dismissed.

Judgment will so enter.