CORNING GLASS WORKS

v.

UNITED STATES.

C.D. 4716.
Court No. 75–8–02008.

United States Customs Court.

Oct. 4, 1977.

Murray Sklaroff, New York City, for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., John J. Mahon, trial atty., New York City, for defendant.

NEWMAN, Judge:

This action concerns the proper tariff classification for certain "Rota" ampul inspection machines imported from West Germany and entered at the port of New York in December 1973 and June 1974. The machines in question are used by pharmaceutical manufacturers to inspect sealed glass containers (ampuls or vials) filled with injectable drugs.

The Rota machines were classified by the regional commissioner of customs as "Optical measuring or checking instruments and appliances not provided for elsewhere in subpart C, D, or F of this part [part 2, schedule 7], and parts thereof: * * * Other", under item 710.90, TSUS, as modified by T.D. 68–9, and assessed with duty in liquidation at the rate of 25 per centum ad valorem.

Plaintiff asserts that the Government's classification is erroneous, and advances four alternative claims:

(1) Item 678.50, TSUS, as modified, *supra,* providing for "Machines not specially provided for", at the rate of 5 per centum ad valorem;

(2) Item 662.20, TSUS, as modified, *supra,* providing for parts of "machinery for filling, closing, sealing, capsuling, or labelling bottles, cans, boxes, bags, or other containers", at the rate of 5.5 per centum ad valorem;

(3) Item 708.85, TSUS, as modified, *supra*, covering "Hand magnifiers, magnifying glasses * * * and similar articles", at the rate of 12.5 per centum ad valorem; and

(4) Item 708.91, TSUS, as modified, *supra*, covering frames and mountings for the articles provided for in item 708.85, at the rate of 15 per centum ad valorem.

■ I have concluded that the merchandise was erroneously classified by the customs officials under item 710.90, TSUS, and plaintiff's claim under item 678.50, TSUS, should be sustained.

## THE STATUTE

The pertinent provisions of the TSUS read as follows: Tariff Schedules of the United States:

SCHEDULE 6.—METALS AND METAL PRODUCTS

* * * * * *

PART 4.—*Machinery and Mechanical Equipment*

* * * * * *

Subpart A.—Boilers, Nonelectric Motors and Engines, and Other General-Purpose Machinery

* * * * *

Machinery for cleaning or drying bottles or other containers; machinery for filling, closing, sealing, capsuling, or labelling bottles, cans, boxes, bags, or other containers; * * * all the foregoing and parts thereof:

* * * * * *

662.20 Other . . . . . . . . . . . . . . . . . . . . . . . . . 5.5% ad val.

* * * * * *

Subpart H.—Other Machines

* * * * * *

678.50 Machines not specially provided for, and parts thereof . . . . . . . . . . . . . . . 5% ad val.

* * * * * *

SCHEDULE 7.—SPECIFIED PRODUCTS; MISCELLANEOUS AND NONENUMERED PRODUCTS

* * * * * *

PART 2.—*Optical Goods; Scientific and Professional Instruments; Watches, Clocks, and Timing Devices; Photographic Goods; Motion Pictures; Recordings and Recording Media*

**1.** The record comprises the oral testimony of one witness for plaintiff and two witnesses for defendant. Plaintiff's witness was David S. Berg, plant manager of the Hodes-Lange plant

Part 2 headnotes:

* * * * * *

3. The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

* * * * * * *

Subpart A.—Optical Elements, Spectacles, Microscopes, and Telescopes, Optical Goods Not Elsewhere Provided for

* * * * * *

Optical appliances and instruments not provided for elsewhere in part 2 of this schedule; frames and mountings for such articles, and parts of such frames and mountings:

708.85 Hand magnifiers, magnifying glasses, loupes, thread counters and similar articles . . . . . . . . . . . . . . . . . . . . . . 12.5% ad val.

* * * * * *

Frames and mountings and parts thereof:

* * * * * *

708.91 For articles provided for in item 708.85 . . . . . . . . . . . . . . . . . . . . . . 15% ad val.

* * * * * *

Subpart C.—Surveying, Navigational Meteorological, Drawing, and Mathematical Calculating Instruments; Measuring and Checking Instruments Not Specially Provided for

* * * * * *

Optical measuring or checking instruments and appliances not provided for elsewhere in subpart C, D, or F of this part, and parts thereof:

710.86 Profile projectors and parts thereof . . . . . . . . . . . . . . . . . . . . . . * * *

710.88 Comparator benches, measuring benches, and micrometric reading apparatus, all the foregoing and parts thereof . . . . . . . . . . . . . . . . . * * *

710.90 Other . . . . . . . . . . . . . . . . . . . . . . . . 25% ad val.

## THE RECORD [1]

The subject importations, "Rota" inspection machines, are used by pharmaceutical

of Corning Glass Works, North Bergen, New Jersey. Hodes-Lange is the North American agent for the Rota Company, the West German manufacturer of the imported machines. De-

manufacturers for the inspection of filled and sealed ampuls containing injectable drugs. Such ampuls are inspected for the purpose of detecting any contamination by visible foreign particulate matter (lint, insect parts, glass particles, etc.), chars (discoloration of the drug caused by exposure to excessive heat during the sealing of the ampul) and missing labels.

Pharmaceutical manufacturers most commonly inspect filled and sealed ampuls manually. In such manual method, the inspector holds several ampuls in her hand, shakes them to get the contents in motion, and then holds the containers up against a suitable background under appropriate lighting. The inspector looks for foreign matter, presence of a leak (as indicated by a dye) and "she may be checking the printing" (R. 24).

Several different machines are available that mechanize the inspection process, "and they serve primarily to hasten it" (R. 24). The Rota machines, while accomplishing the same end result as a simple manual inspection, mechanize the inspection process, thereby increasing the efficiency and productivity of the inspector. Hence, the Rota machines mechanically convey ampuls or similar containers into the inspector's field of vision, at which point they are held there by vacuum chucks and rotated rapidly in order to set the contents in motion. After a brief high speed rotation the motion is stopped, and the contents of the ampul continue swirling around while the operator inspects the ampuls. The purpose of spinning the containers is to make any particulate matter mobile, and thus more readily visible. If an ampul appears defective, the operator may reject it by depressing a button activating a jet of compressed air that blows the defective ampul off the stage. Ampuls that pass inspection are accumulated in a chute at the discharge end of the machine, so that they can be scooped back into a magazine or tray similar to the one in which they were placed originally for conveyance to the operator. The Rota machine has the capacity to handle 3,000 containers per hour, and counts the pieces inspected.

The Rota machine *per se* does not inspect ampuls or containers, but merely aids in the inspection process, which is accomplished by human vision.[2] To aid the inspector's vision, the Rota incorporates a magnifying lens having approximately a 200 percent magnification,[3] through which the ampuls are viewed on an illuminated stage with various backgrounds.[4] The purpose of the magnifying lens was explained by plaintiff's witness, as follows (R. 30):

* * * [W]e view these [Rota] machines primarily as pacing devices—as machines which mechanize the inspection function and pace it. To do that takes quite a bit of mechanism, and the inspector's head is located about 22 to 24 inches away from the point where the containers are on the stage. From that distance, without the lens, you would not be able to see the detail necessary to do the job. So, the lens is introduced to make the containers appear about the way they would appear if you were looking at them close up in your hand.

Consequently, the lens serves to magnify the ampul under inspection so that it ap-

---

fendant's witnesses were: Eugene E. Lakso, president of the Lakso Company, Leominster, Massachusetts; and Eugene J. Kovary, senior supervisor of pharmaceutical engineering for Hoffman La Roche, Inc., Nutley, New Jersey. The record also includes various exhibits offered by the parties, and the official papers which were offered by plaintiff.

2. Ampul inspection can be accomplished without human vision by a completely electronic machine (like the "Autoscan" produced by the Lakso Company—see defendant's exhibit B), that utilizes a combination of light and a television camera (R. 87–88).

3. A 300 percent magnifying lens was also included in the importations as an accessory to be used in lieu of the 200 percent lens (R. 35–36). However, the 300 percent magnifying lens was discarded in use because it caused too much distortion (R. 40).

4. Additionally, the Rota machine "has the capability of introducing a polarizing screen in between the containers and the inspector, so that the inspector is viewing the containers in polarized light * * *" (R. 55).

pears to be the same size as though the inspector were able to view the container at the normal reading distance of ten inches, which is not possible with the Rota machine (R. 33–34). Additionally, the viewing area of the Rota machine is hooded to shield out extraneous light and to avoid distraction to the inspector.

In order to properly perform its ampul inspection purpose, the Rota's conveying, spinning and rejection functions are all essential, as is the magnifying lens feature.

The Rota machines are limited in their purpose to aid inspection. They do not fill or seal ampuls, and are not required for any other machine's operation. Plaintiff does not advertise or otherwise represent that the Rota is *part* of any other machine, or *part* of any integrated or coordinated system of filling or sealing "machinery". Filling and sealing of ampuls in pharmaceutical plants are performed in areas known as "sterile" or "clean rooms", in which no other machinery is present. After filling and sealing, ampuls are sterilized and dye-tested for defects in autoclaves. After autoclaving, the ampuls may remain stored for various periods of time before inspection.

None of the witnesses considered that the Rota machines were similar to hand-held magnifying glasses or frames or mountings for magnifying glasses (R. 77–78, 99, 124).

OPINION

At the outset, it is to be observed that in *Amaco, Inc. v. United States*, 74 Cust.Ct. 172, C.D. 4602 (1975), a "Strunck" ampul inspection unit, functionally similar to the Rota machines involved herein (R. 97, 98, 119), was before the court. The Strunck unit was classified by the customs officials under item 710.90, TSUS, and was claimed by plaintiff to be properly classifiable under item 678.50, TSUS. Plaintiff *conceded* that the inspection performed by the Strunck unit is a "checking" function, and the sole issue joined and briefed by the parties was whether the machine was an "optical instrument". Noting plaintiff's concession, and relying upon the statutory definition of "optical instrument" in headnote 3 of part

2, schedule 7, TSUS, the court held that the Strunck ampul inspection unit was properly classified by the Government under item 710.90.

In addition to noting plaintiff's concession in *Amaco* concerning the "checking" function of the Strunck unit, the court cited *Bruce Duncan Co., Inc., a/c Staalkat of America, Inc. v. United States*, 67 Cust.Ct. 430, C.D. 4312 (1971). There, the court held that the "candling" or grading function performed by an egg handling machine, which function involved an internal inspection of eggs under a light source for the purpose of detecting discoloration and other imperfections, constituted "checking" within the purview of the superior heading to items 710.60 through 710.80, TSUS, covering *inter alia* "non-optical measuring or checking instruments, apparatus, and machines not specially provided for".

■ Defendant contends that *Amaco* is *stare decisis* in the present case. Fundamentally, of course, a decision in a prior case involving the same merchandise and the same issue is ordinarily *stare decisis* of the succeeding case. *Manca, Inc. v. United States*, 47 CCPA 103, C.A.D. 738 (1960); *United States v. Dodge & Olcott, Inc.*, 47 CCPA 100, C.A.D. 737 (1960); *B. Axelrod & Co. v. United States*, 70 Cust.Ct. 117, C.D. 4417 (1973).

■ Plaintiff, however, correctly insists that *Amaco* is not dispositive here, since unlike the prior case, plaintiff—relying upon the doctrine of *ejusdem generis*—does not concede, but rather disputes, that the Rota inspection machines perform a "checking" function within the meaning of that term in the statute. Significantly, there is no indication in either the *Amaco* or *Bruce Duncan* decision that the legislative history of items 710.86 through 710.90, TSUS, or the rule of *ejusdem generis*—urged by plaintiff here—was submitted to, or considered by the court in connection with construing the term "checking". It will bear repetition to state, again, that the sole issue joined and briefed by the parties in *Amaco* was whether the Strunck machine was an

"optical instrument". And indeed, in *Bruce Duncan* the provisions of items 710.86 through 710.90 were not involved in that case, but rather the superior heading to items 710.60 through 710.80.

Plainly, the doctrine of *stare decisis* is inapplicable where, as in the present case, a new issue is raised. *Neumann-Endler, Inc. v. United States*, 27 CCPA 53, C.A.D. 61 (1939); *Rico Import Co. v. United States*, 65 Cust.Ct. 554, C.D. 4138, 320 F.Supp. 989 (1970), *aff'd*, 469 F.2d 699, 60 CCPA 15, C.A.D. 1075 (1972).

Judge Re (now Chief Judge of this Court), in an address delivered at a Seminar for Federal Appellate Judges, entitled *Stare Decisis and the Judicial Process*, published in 22 The Catholic Lawyer 38 (1976), cited Black's *Law of Judicial Precedents*. Judge Re stressed that Black "highlighted the importance of the issues presented in the prior case", and went on to quote from Black (at 39–40):

A decision is not authority as to any questions of law which were not raised or presented to the court, and were not considered and decided by it, even though they were logically present in the case and might have been argued, and even though such questions, if considered by the court, would have caused a different judgment to be given.

Inasmuch as the present case involves a controversy concerning the term "checking" and the applicability thereto of *ejusdem generis*, which issue was not before the court in *Amaco*, I am clear that the prior case is not dispositive by virtue of the *stare decisis* doctrine. Moreover, since the term "checking" has several possible interpretations,[5] the intent of Congress as it may be gleaned from the legislative history is appropriate for consideration.

Before addressing the applicability of the *ejusdem generis* doctrine to the construction of the term "checking", we shall consider the legislative history of items 710.86 through 710.90, TSUS.

In the *Tariff Classification Study Explanatory and Background Materials* (November 15, 1960), Schedule 7, page 150, the drafters of the tariff schedules set forth the intended scope of items 710.86 through 710.90, TSUS: [6]

Item 710.86 through 710.90—The third superior heading in this subpart would provide for "optical measuring or checking instruments and appliances not provided for elsewhere in subpart C, D, or F of this part". These three items (which were included in subpart D of this part in the draft published for public hearings) embrace a number of optical instruments used for measuring and checking materials and products in laboratories, machine shops, inspection stations and the like. Such instruments would include profile projectors used for checking the shape and dimensions of machined articles, optical comparators, comparator and measuring benches, interferometers, optical surface testers, alignment telescopes, micrometric reading apparatus and *similar instruments*. The instruments included in these categories all incorporate optical devices of various types, but instruments whose only optical element consists of a magnifying device for reading scales or for carrying out adjustments are not included (see headnote 3 of this part). * * [Emphasis added.]

Similarly, the *Summaries of Trade and Tariff Information* (1970), Schedule 7, Vol. 2, p. 155, describe the merchandise covered

---

**5.** See *Webster's Third New International Dictionary* (Unabridged), 1966, p. 381.

**6.** This study was submitted by the Tariff Commission to Congress prior to the effective date of the TSUS, and is regarded by the courts as an authoritative source for determining legislative intent. See, e. g.: *Certified Blood Donor Services, Inc. v. United States*, 511 F.2d 572, 62 CCPA 66, C.A.D. 1147 (1975); *Kurt S. Adler,*

*Inc. v. United States*, 496 F.2d 1220, 61 CCPA 68, C.A.D. 1122 (1974); *Albert E. Price, Inc. v. United States*, 476 F.2d 1354, 60 CCPA 127, C.A.D. 1095 (1973); *Wayne Withrow Conrac Division v. United States*, 477 F.2d 1393, 60 CCPA 144, C.A.D. 1101 (1973); *Rifkin Textiles Corp. v. United States*, 54 CCPA 138, C.A.D. 925 (1967), *cert. denied*, 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967).

by items 710.86 through 710.90, TSUS, as follows:[7]

*Description and uses*

The optical instruments discussed herein are used for measuring and checking materials and products in laboratories, machine shops, and inspection stations, and for similar technical requirements.

Item 710.86 includes: (1) profile projectors, used for checking the shape and dimensions of a wide variety of objects (pieces cut to shape, gears and pinions for small-sized mechanisms, screws, screwtaps, chasers, etc.) or for examining surfaces; and (2) optical or graduated scale comparators, for checking the dimensions of a part being manufactured against a standard piece; and parts thereof.

Item 710.88 includes: (1) comparator benches for checking elongation, lengths, surfaces, etc., (2) measuring benches for large parts, thread gauges, gear cutters, threaded shafts for lathes, cross members, etc., and (3) micrometer reading apparatus for checking movement of tables of machine tools; and similar instruments, and parts thereof.

Item 710.90 includes: (1) optical surface testers for gauging the condition of surfaces by means of a combination of a prism and a lens, (2) alignment telescopes for checking straightness of benches and machine slides and measuring metallic constructions, (3) optical goniometers or angle gauges for checking sharpening angles of teeth or blades during sharpening; and (4) other optical measuring or checking instruments, and parts thereof.

See also the *Explanatory Notes to the Brussels Nomenclature,* Vol. 3, Section XVIII, Heading 90.16, which describe the optical measuring and checking instruments

mentioned in the *Tariff Classification Study.*

■ As may be seen above, the *Tariff Classification Study* enumerates specific optical measuring and checking instruments intended to be covered by items 710.86 through 710.90, and further states that "similar instruments" are also included. As shown by the *Summaries of Trade and Tariff Information and Explanatory Notes to the Brussels Nomenclature,* the articles specifically enumerated above in the *Tariff Classification Study* are all used for either measuring or checking the correctness of some form of measurement. Consequently, the *similar instruments* mentioned must have one or both of these uses. Admittedly, the Rota machines are used to "check" ampuls for the presence of particulate matter, "chars" and missing labels, and not for the correctness of any form of measurement. Hence, I conclude that the Rota machines are not one of the "similar instruments" which Congress intended should fall within the purview of item 710.90, TSUS.

■ Turning now to the issue of *ejusdem generis,* our Appellate Court has observed that "the rule is ordinarily applied to *limit* provisions in which general words follow a specific enumeration of articles". [Emphasis added.] *United States v. Ampex Corp.,* 460 F.2d 1086, 1087, 59 CCPA 134, 137, C.A.D. 1054 (1972). Parenthetically and interestingly, a forerunner resembling the *ejusdem generis* doctrine is enunciated in the Sifra and the Commentary on Leviticus as one of the thirteen exegetical principles of logic by which The Law is expounded and interpreted by the sages.[8]

■ Relying heavily upon the rule of *ejusdem generis,* plaintiff argues that the

---

7. The *Summaries of Trade and Tariff Information* have been referred to by our appellate court as an aid in determining the scope of tariff provisions. See, e. g., *American Bristle & Hair Drawing Co., Keer Maurer & Co. v. United States,* 458 F.2d 524, 527, 59 CCPA 104, 108, C.A.D. 1048 (1972); *Tanross Supply Co., Inc. v. United States,* 433 F.2d 1332, 1336, 58 CCPA 26, 31, C.A.D. 1000 (1970). See also *Lyons Export & Import, Inc. v. United States,* 461

F.2d 830, 831, 59 CCPA 142, 144, C.A.D. 1056 (1972). See also *Oxford International Corporation v. United States,* 75 Cust.Ct. 58, 66–67, C.D. 4608 (1975).

8. See Hertz, *Daily Prayer Book With Commentary* (Bloch Publishing Co., rev.ed.1948), p. 43; and Birnbaum, *High Holyday Prayer Book* (Hebrew Publishing Co., 1951), pp. 84–88.

articles named in items 710.86 and 710.88, TSUS, all either measure or check the correctness of measure, and that by virtue of the rule, an article to be classifiable under the general provision for "Other" in item 710.90, TSUS, must likewise either measure or check the correctness of measure.

In a word, I find merit in the plaintiff's position. On the basis of the very reasons indicated *supra* for concluding that the Rota machines are not one of the "similar instruments" referred to in the *Tariff Classification Study,* I also find that the machines are not *ejusdem generis* with the articles specifically enumerated in items 710.86 and 710.88, TSUS, as claimed by plaintiff.

■ In determining whether a particular article is included within the general words of the statute, "the courts have looked to the enumerated articles to ascertain the characteristics which they possess in common". *Kotake Co., Ltd. et al. v. United States,* 266 F.Supp. 385, 387–88, 58 Cust.Ct. 196, 199, C.D. 2934 (1967).

Thus, in *Merck & Co. (Inc.) v. United States,* 19 CCPA 16, T.D. 44852 (1931), it was held that in view of the legislative history and the rule of *ejusdem generis,* the provision for "other saccharides" in paragraph 504 of the Tariff Act of 1922 covering named products which were, for the most part, rare and expensive saccharides used for bacteriological testing and medicinal diagnosis, was not applicable to sugar of milk, a saccharide product which was inexpensive and commonly used commercially in infant food. Hence, the appellate court *restricted* the residual provision for "other saccharides" to saccharides of like character, material and use to those specifically named in the paragraph.

Further, in *European Trading Co. v. United States,* 19 CCPA 82, 86–87, T.D. 45225 (1931), our appellate court decided

that in determining whether certain wire netting used for holding stucco in the sides of buildings was within the scope of the provision in paragraph 312 of the Tariff Act of 1922 for "all other structural shapes", it was "eminently proper to consider the question as to whether the articles sought to be included within its terms are of the same kind, class or nature as the articles specifically named in the paragraph * * * ".

And in *Oxford International Corporation v. United States,* 75 Cust.Ct. 58, C.D. 4608 (1975), applying the doctrine of *ejusdem generis,* the court held that taillights for bicycles do not fall within a provision for "other sound or visual signalling apparatus" following an enumeration for "Bells, sirens, indicator panels, burglar and fire alarms" in item 685.70, TSUS, since all of the named devices are activated or function in temporary or abnormal situations only, while taillights operate continuously, and do not warn of the existence of emergencies or special circumstances. For other cases applying the doctrine of *ejusdem generis* see also: *Mego Corp. v. United States,* 505 F.2d 1288, 62 CCPA 14, C.A.D. 1137 (1974) (miniature pinball article held not to be within the provision for "other games played on boards of special design"); *Wells, Fargo & Co. v. United States,* 8 Ct.Cust.Appls. 125, T.D. 37266 (1917) ("Other mechanical process").

Defendant insists that "[i]rrespective of whether or not all of the articles provided for in items 710.86 and 710.88, TSUS, do measure or check the correctness of measure, the doctrine of *ejusdem generis* has no application * * * [in this case]". Continuing, defendant urges that the rule is inapplicable here because there are three different tariff provisions under the superior heading to items 710.86 through 710.90, and this is not a case where a class of articles is provided for *after* certain members of the class have been enumerated.[9] I

9. Defendant states in its brief that the *"superior heading* [preceding items 710.86 and 710.88, TSUS] contains the *general terms* of the class of articles, 'optical measuring and checking instruments and appliances * * * and parts thereof', while the inferior provisions, items

710.86 and 710.88, TSUS, contain *particular descriptions* of articles, with item 710.90, TSUS, providing for *all* other optical measuring and checking instruments and appliances, not specially provided for elsewhere". [Emphasis by defendant.]

am unable to agree with the analysis of the statute by able counsel for the defendant.

■ Inferior headings or item numbers appearing below a superior heading must be construed with reference to each other, and with reference to the superior heading— viz., construed as a whole.[10] Obviously, the residual or "basket" provision "Other" in item 710.90, standing isolated from the preceding inferior provisions (items 710.86 and 710.88) and the superior heading, is totally meaningless. Plainly, then, the scope of the merchandise embraced by item 710.90 is ascertainable only with reference to its superior heading and the preceding items, 710.86 and 710.88, TSUS.[11] Accordingly, reading the pertinent statutory provisions as a whole, items 710.86 and 710.88 cover enumerated optical measuring or checking instruments and appliances at certain rates of duty; and a residual class "Other" (optical measuring or checking instruments and appliances) is covered at a separate rate of duty in item 710.90. Inasmuch as the general class of articles covered by item 710.90 *follows* the specifically enumerated articles in items 710.86 and 710.88, the doctrine of *ejusdem generis* is clearly apposite.

The short of the matter is that in view of the legislative history referred to herein and the doctrine of *ejusdem generis,* the court disagrees with the defendant that the *Amaco* decision is *stare decisis,* and finds that the Rota machines were erroneously classified by the Government under item 710.90, TSUS. Consequently, it is unnecessary to reach the vigorously disputed question of whether the magnifying lens incorporated in the Rota brings the machines within the definition of "optical instruments" in headnote 3 of part 2, schedule 7. This court, of course, has noted that such question was decided favorably to defendant in connection with the Strunck machine in *Amaco.*

■ It is fundamental that notwithstanding the Government's classification has been shown to be erroneous,[12] plaintiff had the burden of establishing the correct classification. See Sturm, *A Manual of Customs Law* (1974), p. 383. As previously stated, plaintiff makes four alternative claims. I have carefully considered these claims, and find that all except item 678.50, TSUS, are without merit.

■ In support of its claim under item 662.20, TSUS, plaintiff contends that inspection is the last step in the ampul filling and sealing operation, and therefore the Rota machine is "part of an aggregate of means to produce a filled, sealed ampul". The record, however, fails to sustain that contention.

Indeed the evidence clearly shows that the Rota machines have no role in sealing or filling ampuls, nor are Rotas even used in the same area with machinery utilized for filling and sealing ampuls (R. 65–66, 97). The record further shows that ampuls which are filled and sealed are subjected to autoclaving before they are inspected (R. 68, 115); and that inspection with the Rota machines may not take place until *after* the ampuls have been stored for extensive periods of time (R. 69, 115). In sum, plaintiff has failed to establish that the Rota ma-

---

10. For example, General Interpretative Rule 10(c)(i) provides:

   "(i) A superior heading cannot be enlarged by inferior headings indented under it but can be limited thereby;"

11. Since the superior heading to items 710.86 through 710.90 expressly excludes optical measuring or checking instruments and appliances provided for in subparts C, D and F of part 2, schedule 7, it is apparent that the superior and inferior headings must also be construed in conjunction with pertinent provisions in subparts C, D and F.

12. Plaintiff argues that inasmuch as the Government has never disclosed whether the imported machines were classified as "measuring" or as "checking" instruments under item 710.90, TSUS, no presumption of correctness attaches to the classification, citing *Broadway-Hale Stores, Inc. v. United States,* 63 Cust.Ct. 194, C.D. 3896 (1969). Defendant disputes that contention, citing *United States v. John V. Carr & Son, Inc.,* 495 F.2d 771, 61 CCPA 41, 45, C.A.D. 1116 (1974). Since we have found that the classification is erroneous as a matter of law, it is unnecessary to decide whether or not there was initially a presumption of correctness attaching to the classification.

chines are parts of machinery used for filling and sealing bottles, cans, boxes, bags, or other containers, and therefore its claim under item 662.20, TSUS, is dismissed.

Plaintiff's alternative claims that the Rota machine is an article similar to a magnifying glass (item 708.85) or is a frame or mounting for a magnifying glass (item 708.-91) are so patently lacking in merit as to require no discussion. Accordingly, plaintiff's claims under items 708.85 and 708.91 are dismissed.

Finally, since the Rota is unquestionably a machine within the common meaning of the term, and as I have found that there is no other tariff description which more specifically describes the imports than item 678.50, TSUS, I conclude that the merchandise in issue is properly dutiable as machines not specially provided for.

Judgment will be entered accordingly.