(C.D. 4807)

CORNING GLASS WORKS, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 75-8-02008

(Decided on remand [C.A.D. 1216] June 18, 1979)

*Murray Sklaroff*, Esq., for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation, *John J. Mahon*, trial attorney, Esqs., for the defendant.

NEWMAN, Judge: This action is here on remand from the Court of Customs and Patent Appeals in *United States* v. *Corning Glass*

*Works*, 66 CCPA—, C.A.D. 1216, 586 F. 2d 822 (1978), which recently reversed the judgment for plaintiff in *Corning Glass Works* v. *United States*, 79 Cust. Ct. 72, C.D. 4716, 448 F. Supp. 262 (1977), reh. denied, 80 Cust. Ct. 22, C.D. 4733 (1978).

This dispute concerns the proper tariff classification for certain "Rota" machines for the optical inspection of ampuls (Rotas) imported from West Germany and entered at the port of New York in December 1973 and June 1974. In liquidation of the entries, Customs assessed duty at the rate of 25 per centum ad valorem under the provision in item 710.90, TSUS, as modified by T.D. 68–9, for "[o]ptical measuring or checking instruments * * *". Corning claims, inter alia, that the Rotas are properly dutiable at the rate of 5 per centum ad valorem under the provision in item 678.50, TSUS, as modified by T.D. 68–9, for "[m]achines not specially provided for * * *".[1]

### BACKGROUND

In C.D. 4716, I held that the Government's classification of the Rotas under item 710.90 was erroneous, since they perform neither a measuring nor checking function within the purview of the statute. Inasmuch as such finding was sufficient to negate the propriety of defendant's classification under item 710.90, it was unnecessary to reach the question of whether the Rotas were "optical instruments", as defined in headnote 3, part 2, schedule 7 (headnote 3). Additionally, I held that there is no other tariff description which more specifically describes the imports than item 678.50, and concluded that the merchandise in issue is properly dutiable under that provision. Plaintiff's other alternative claims were found lacking in merit and dismissed.

In support of its motion for rehearing, defendant contended that whether or not the Rota performs a measuring or checking function, there exists an unrebutted presumption that the Rota is an optical instrument by virtue of its classification under item 710.90, and that such presumption precludes classification under item 678.50, TSUS. On the basis of the asserted presumption, defendant suggested, as illustrative, that the merchandise was more specifically provided for under item 708.89, TSUS, covering "[o]ptical appliances and instruments not provided for elsewhere * * * [o]ther * * *", than under item 678.50.[2] However, defendant failed to assert item 708.89 as an affirmative defense, and expressly disavowed item 708.89 as an alternative classification. Consequently, defendant's motion for rehearing was denied, 80 Cust. Ct. 22, C.D. 4733 (1978).

---

[1] Plaintiff alternatively claims that the merchandise is properly dutiable under: Item 662.20, providing for parts of "machinery for filling, closing, sealing, capsuling, or labeling bottles, cans, boxes. bags, or other containers", at the rate of 5.5 per centum ad valorem; item 708.85, covering "[h]and magnifiers, magnifying glasses * * * and similar articles", at the rate of 12.5 per centum ad valorem; and item 708.91, covering "[f]rames and mountings, and parts thereof: For the articles provided for in item 708.85", at the rate of 15 per centum ad valorem.

[2] General Interpretative Rule 10(c) requires that an article be classified under the provision which most specifically describes it.

On appeal, the Court of Customs and Patent Appeals, in an opinion by Chief Judge Markey, reversed and held that the Rotas perform a "checking" function within the purview of item 710.90, TSUS, and remanded the case to this court for an initial evaluation of the conflicting testimony concerning whether the magnifying lens serves a "subsidiary purpose" within the purview of headnote 3.

In connection with the remand, this court permitted oral argument (on plaintiff's request) and the submission of supplemental briefs concerning the question of whether the Rotas are "optical instruments" as defined in headnote 3. Plaintiff's motion to amend the complaint for the purpose of interposing a new alternative claim under item 710.80, TSUS, was denied on December 20, 1978. *Cf. Ataka America, Inc.* v. *United States*, 80 Cust. Ct. 132, C.D. 4745 (1978).

For the reasons indicated below, I have determined that the Rotas are classifiable as "optical instruments" as defined in headnote 3, and accordingly judgment must be entered for defendant.

## THE RECORD

The record establishes the following pertinent facts: [3]

The Rota, which is described in the manufacturer's promotional literature as a "machine for optical inspection of ampoules", is used by pharmaceutical manufacturers for the optical inspection of sealed ampuls containing injectable drugs. This inspection is intended to discover the presence of any visible contaminants in the drug solution, chars (discoloration of the drug caused by exposure to excessive heat during the sealing of the ampul) and missing labels.

The Rotas operate in the following manner. An input chute accepts the ampuls and presents them to a conveying rod comprised of a bar several feet long with holes. This rod is lowered over the ampuls and moves them horizontally to the operator's field of vision. There, the ampuls are rapidly rotated to set their contents in motion. After a brief high-speed rotation, the motion is stopped while the ampuls' contents continue swirling around, at which time the inspector views them. The purpose of spinning the ampuls is to make any particulate matter more mobile, thus enhancing the visibility of any contamination. Any ampuls that appear upon inspection to be unsatisfactory may be rejected by the inspector by simply depressing a button activating a jet of compressed air that blows the defective ampul off the viewing stage. Rejection occurs within the view of the inspector, thus allowing the inspector to know immediately if the correct reject

---

[3] The record consists of the oral testimony of one witness for plaintiff and two witnesses for defendant. Plaintiff's witness was David S. Berg, manager of plaintiff's plant in North Bergen, N.J. Defendant's witnesses were: Eugene E. Lakso, president of the Lakso Co., Leominster, Mass., which manufactures, among other equipment, a completely electronic machine for inspecting ampuls; and Eugene J. Kovary, senior supervisor of pharmaceutical engineering for Hoffman La Roche, Inc., Nutley, N.J., 1 of the 10 largest pharmaceutical manufacturers in the world. The record also includes various exhibits offered by the parties, and the official papers, which were offered by plaintiff.

button was pushed. Ampuls that pass inspection are accumulated in a chute at the discharge end of the machine.

The Rota machine per se does not inspect ampuls, but the inspection process depends upon human vision. An essential feature of the Rota machine is a magnifying lens through which the ampuls must be viewed by the operator. The lens is usually of 200 percent magnification, although a 300-percent magnifying lens was also included in the importations as an accessory to be used in lieu of the 200-percent lens. However, the 300-percent magnifying lens was discarded in use because it caused too much distortion.

The lens magnifies the ampuls under inspection so that they appear to be the same size as though the inspector were able to view them at the normal reading distance of 10 inches. Plaintiff's witness stated that, due to the design of the Rota machine, "it's physically impossible to get close enough to the containers to see them" (R. 74).

At the inspection point, the ampuls are viewed against a background that can be varied from light to dark or in polarized light. Additionally, fluorescent and incandescent lights are used at the inspection point in the Rota to illuminate the ampuls. The viewing area of the Rota is hooded to shield out extraneous light and to avoid distraction to the inspector.

Defendant's witness Lakso testified that, while the hardware involved in the conveying, spinning, and rejection features of the Rota is substantial, these features are subordinate to the actual viewing or inspection of the containers, which he said is the primary function of all of the equipment involved. Defendant's witness Kovary similarly testified that inspection is the primary purpose of the Rota, and considered the conveying, spinning, and rejection functions as auxiliary to the inspection.

### OPINION

Against this background, we turn to the issue of whether the Rotas meet the statutory definition of "optical instruments", as defined in headnote 3. That headnote reads:

> 3. The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

The centerpiece of this phase of the case is the term "subsidiary purpose" as used in the headnote. Presumptively, of course, in classifying the merchandise under item 710.90, Customs found that the optical element of the Rota (viz, a magnifying lens)[4] is not used for a "subsidiary purpose". Amaco, Inc. v. United States, 74 Cust. Ct. 172, 174, C.D. 4602 (1975).[5]

---

[4] The term "optical elements" includes lenses. Norman G. Jensen, Inc. v. United States, 77 Cust. Ct. 9, 14, C.D. 4668 (1976).

In *Amaco*, a "Strunck" ampul inspection machine "essentially the same as that here involved" (*Corning Glass*, 66 CCPA at—, n. 6), was found to have been correctly classified under item 710.90. There, plaintiff conceded that the inspection performed with the Strunck unit is a "checking" function, and the sole issue was whether the machine is an optical instrument.

Corning maintains that *Amaco* "cannot serve as *stare decisis*, or as any sort of precedent", assertedly because the plaintiff in *Amaco* did not address itself to the optical instruments issue, and also because that case was decided on the basis of plaintiff's failure to overcome the presumption of correctness attaching to the classification (supplemental brief, at 7–8). I disagree.

Although in *Amaco* the plaintiff relied upon "Judicially established criteria" rather than upon headnote 3, the optical instruments issue was vigorously argued by *Amaco*. In that connection, *Amaco* insisted that the lens was not necessary to the operation of the machine, and that the aid provided by the lens was incidental to the function of the machine. Regarding this aspect, Judge Landis observed (74 Cust. Ct. at 178):

> What plaintiff has done is to marshal the facts into an argument that separates the mechanical parts of the imported unit from the optical element in the checking function. While the imported unit will undoubtedly mechanically operate without the optical element, the checking function cannot, or at least there is no proof that it is, completed by the operator without the assistance of the incorporated optical element or a substitute device.

It is evident from the court's opinion in *Amaco* that notwithstanding the plaintiff's reliance on judicially established criteria, the underpinning for the court's decision was plaintiff's failure to sustain its burden of proof under the statutory definition of "optical instruments" in headnote 3. Thus, Judge Landis held that "[p]resumptively the optical element is incorporated for a purpose that is not subsidiary to the checking function", and concluded that plaintiff had failed to overcome that presumption.

Here, Corning has failed to show "clear error" in the *Amaco* decision, and therefore the salutary doctrine of *stare decisis* applies. *United States* v. *Dodge & Olcott, Inc.*, 47 CCPA 100, 103, C.A.D. 737 (1960); *United States* v. *Mercantil Distribuidora et al.*, 45 CCPA 20, 23–24, C.A.D. 667 (1957). In an article entitled "Stare Decisis", presented at a Seminar for Federal Appellate Judges, Chief Judge Re observed (79 F.R.D. 509 (1979)):

> Basic to our discussion is the understanding that, in the common law world, a judicial decision serves a dual function.

---

[5] Plaintiff has persistently contended throughout this litigation that there is no presumption of correctness attaching to the classification under item 710.90 because the Government did not designate under which term, "measuring" or "checking", the classification was made. However, irrespective of whether Customs classified the Rotas as "measuring" or as "checking" instruments, the classifying officer must be presumed to have found that they were "optical instruments" since such finding was required for either classification. *Cf. Novelty Import Co., Inc.* v. *United States*, 53 CCPA 28, C.A.D. 872 (1966).

First, it settles the controversy, that is, under the doctrine of *res judicata* the parties may not relitigate the issues that have been decided. Second, in the common law system, under the doctrine of *stare decisis*, the judicial decision also has precedential value. The doctrine, from *stare decisis et non quieta movere*, "stand by the decision and do not disturb what is settled," is rooted in the common law policy that a principle of law deduced from a judicial decision will be considered and applied in the determination of a future similar case. In essence, this policy refers to the likelihood that a similar or like case arising in the future will be decided in the same way.

Significantly too, *Amaco* was cited with approval by the Court of Customs and Patent Appeals in *United States* v. *Ataka America, Inc.*, 64 CCPA 60, 65, n. 4, C.A.D. 1184, 550 F. 2d 33 (1977), respecting the controlling effect of headnote 3 in the classification of articles as "optical instruments". Additionally, *Amaco* was cited by Judge Maletz in *Norman G. Jensen, Inc.* v. *United States*, 77 Cust. Ct. 9, 13, C.D. 4668 (1976) in connection with the statutory definition of "optical instruments".

Although involving different merchandise than that now before us, the rationale of *Ataka* is apposite. In *Ataka*, the issue was whether certain fiberscopes were properly classified in liquidation under item 709.05, TSUS, as "Other" optical instruments, or were properly dutiable under item 709.17, TSUS, as "Other" electro-medical apparatus, as claimed by the importer. The fiberscopes, in addition to their optical function employed in examining certain internal portions of a patient, possessed the functions of enabling the performance of biopsies, cytologies, and photography.

Chief Judge Markey writing for the Appellate Court in *Ataka*, reviewed the requirements for "optical instruments", as defined in headnote 3, and the various criteria developed by "existing customs practice", as summarized in *Engis Equipment Company* v. *United States*, 62 Cust. Ct. 29, C.D. 3670, 294 F. Supp. 964 (1969). After holding that the *Engis* criteria are not determinative in every case, but are useful in determining the statutory meaning of "optical instruments",[6] the Appellate Court noted (64 CCPA at 66):

> * * * Broadly, therefore we conclude that the term "optical instrument(s)" encompasses devices which act upon or interact with light, which permit or enhance human vision through the

---

[6] In *Ataka*, the Appellate Court held that "[T]he *Engis* criteria, though neither controlling nor exhaustive, do provide an appropriate compendium of 'optical instrument' characteristics". 64 CCPA at 65, n. 4. In *Engis*, the Customs Court found the following characteristics necessary to qualify a device as an "optical measuring instrument" (62 Cust. Ct. at 32);

* * * First, the device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components. * * * Second, the device's optical elements must be essential to its operation; that is, to be considered an optical measuring instrument, the device cannot be operated in its intended manner without the optical components. * * * Third, optical measuring instruments must, in performing their intended function of measurement, act upon, deal with, or route rays of light. This interaction between light and such optical elements as lenses, prisms and mirrors normally manifests itself in divergence, convergence, reflection, refraction, polarization, or merely conveyance of light rays. * * * Finally, the optical system of the instrument must aid human vision or create for inspection a picture or image of some object. [Citations omitted.]

use of one or more optical elements, and in light of headnote 3, which utilize the optical properties of the device in something beyond a "subsidiary" capacity. See *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183 (1941).

Further, the Appellate Court pointed out that under headnote 3, the issue is not whether the optical element is "subsidiary" or "dominant", but rather "the statutory distinction is between 'subsidiary' and not 'subsidiary' " (64 CCPA at 66, n. 5).

Ataka had argued that the optical features of the fiberscopes acted in a subsidiary capacity to the biopsy-cytology functions, thereby excluding the merchandise from classification as "optical instruments" pursuant to headnote 3. Addressing the claimed subsidiary character of the optical features of the fiberscope, Chief Judge Markey commented (64 CCPA at 67):

It remains to be determined whether, as Ataka argues, the optical features of the instrument act in a subsidiary capacity to the biopsy-cytology functions, thereby excluding the fiberscopes from classification as "optical instruments," pursuant to headnote 3.

Testimony adduced at trial established that visualization is essential in the performance of biopsies and cytologies with the imported fiberscope. Ataka's argument that, in the performance of biopsies and cytologies, the optical function is subsidiary to the biopsy-cytology operation, though supported in part by the opinion testimony of one witness, is without merit. The imported device must be considered as a whole. Whether a feature be dominant or subsidiary cannot be determined by isolating a particular employment of the device. The use frequency of the biopsy and cytology capabilities of the fiberscopes varied from physician to physician and from hospital to hospital. It was undisputed, however, that all who used the instrument, for any p urpose, used it to *view* the interior of a body organ. Depending upon the situation, that visual operation may be all that is performed. It is only after visual examination that a decision to take a biopsy or cytology specimen can be made.

To term optical features merely subsidiary to biopsy-cytology features, when the latter *require* the former, and when the latter are not always used and the former are always used, would be contrary to reason. Accordingly, we hold the imported fiberscopes meet the definition of "optical instruments" in headnote 3. * * *

Here, as in *Ataka*, plaintiff posits that the optical element of the merchandise is subsidiary to its nonoptical features. Hence, the thrust of Corning's argument is that "in the overall purpose for which mechanical inspection machines are designed, any enhancement of vision *is at most subsidiary* to the main purpose of the machine, that is, pacing, speed-up, uniformity of the entire inspection process, which, in turn, is one step in producing a saleable ampul" (supplemental brief, at 4). [Plaintiff's italic.] There is no merit in this argument.

The record is clear that the purpose of utilizing the Rota is for the visual inspection of ampuls. The conveying feature merely brings the

ampuls to the inspection point; the spinning feature serves only the purpose of making the presence of particulate matter more readily visible during inspection; and it is only *after visual inspection* of the ampul that a decision can be made by the operator to pass the ampul as saleable or reject it.[7] As noted by our Appellate Court in *Ataka* (64 CCPA at 67), "[d]epending upon the situation, [a] visual operation may be all that is performed. It is only after visual examination that a decision to take a biopsy or cytology specimen can be made."

Indeed, the Rota itself is so designed that the only way the ampuls can be properly seen during normal operation is through the lens. On this score, plaintiff's witness Berg explained that due to the design of the machine, the inspector's head is located about 22 to 24 inches away from the point where the containers are on the stage, and then testified on direct examination (R. 30):

> * * * From that distance, *without the lens, you would not be able to see the detail necessary to do the job.* So, the lens is introduced to make the containers appear about the way they would appear if you were looking at them close up in your hand. [Italic added.]

And on cross-examination Berg admitted (R. 70-71):

> Q. Did you testify that the lens was necessary for the inspection machines to function as they are intended?
> A. As it is intended—it is necessary.

> Q. And is the function of the lens to put the ampul—by means of magnification—in a position where it would be the same size as if it were to be held by the operator, in his hand, close to his face?
> A. That was the point I was trying to make—yes—that, because the lens is there, you are then able to see these containers—which is at some distance from you—as if you were holding it at normal viewing distance.

> Q. *So, the result of the magnification of the ampul allows the successful operation of the machine?*
> A. *Yes.* [Italic added.]

Further, defendant's witness Lasko opined that the conveying, spinning, and rejection functions are subordinate to the inspection operation itself, which is the primary function of the Rota.

In short, the conveying, spinning, and rejection features of the Rota are intimately related to the viewing of the ampuls for inspection purposes, which must be performed with the aid of the magnifying lens. Paraphrasing, *Ataka*, it is undisputed that all who used the Rota used it to *view* ampuls and their contents. Since optical inspection of ampuls is the function of the Rota, and visualization must be accom-

---

[7] The rejection function is performed in the operator's view so that the operator can verify that the defective ampul has been rejected.

plished by means of its optical element, the optical element plainly does not serve a "subsidiary purpose" under the rationale of *Ataka.*

Plaintiff attempts to equate the function of the Rota's lens with an optical element used merely for viewing a scale. In support of that argument, plaintiff relies on *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183 (1941). There, a machine used for testing the hardness of metals operated by first indenting the metal to be tested (utilizing nonoptical apparatus), and thereafter a microscope was employed to measure the previously—and independently—made indentation, which indicated the hardness of the metal. The Court of Customs and Patent Appeals held that the hardness testing machines were not optical measuring or optical testing instruments, observing (29 CCPA at 143–44):

> So, while the articles here involved each contains a microscope which is used to measure an indentation made by the articles, such measurement is not the dominant or primary function for which the article is designed. The microscope is used to measure an indentation upon the metal made by the article itself, at a predetermined load.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> \* \* \* In our opinion an article cannot be classified as an optical measuring or optical testing instrument unless the dominant or primary use of the article lies in the employment of its optical features. Therefore, since it cannot be said that the dominant or primary use of the article here involved lies in the employment of the microscope, we hold that such article is not an optical measuring or optical testing instrument classifiable under paragraph 228(a). [Italic in original.]

But *American Machine* is readily distinguishable from the present case.

First, it is noted that the *American Machine* decision predates the TSUS, and consequently does not specifically address the phrase "subsidiary purpose" in headnote 3, with which we must now deal.

Second, *American Machine* is distinguishable on its facts. The dominant or primary function of the device in *American Machine* was to make an indentation in the metal being tested for hardness. The optical element (viz, a microscope) was used merely to measure the results of the test, but played no role in the machine's denting function. By contrast, the Rota's primary function is the optical inspection of ampuls, and the magnifying lens concededly must be employed to perform such function. The fact that the Rota incorporates nonoptical apparatus to mechanize and pace the inspection process does not alter the fact that the machine's function is optical inspection. Since the Rota's sole purpose is optical inspection, its optical element is obviously at least coequal in function to the machine's nonoptical

features. Accordingly, the Rota is not analogous to the denting device in *American Machine*, wherein the microscope was used merely to obtain a readout or measurement of the results achieved independently by the nonoptical features of the machine.

Although *American Machine* teaches that an article cannot be classified as an optical instrument unless the dominant or primary use of the article lies in the employment of its optical features, it must be recognized that the optical element itself need not be the most important or dominant element of the instrument. As held in *Ataka*, "the statutory distinction is between 'subsidiary' and not 'subsidiary'" (64 CCPA at 66, n. 5). See also, *Parsons Optical Laboratories et al.* v. *United States*, 68 Cust. Ct. 143, 148, n. 1, C.D. 4351 (1972). To reiterate, the Rota's magnifying lens is functionally at least coequal to the conveying, spinning, and rejection features and not "subsidiary". Therefore, I am unable to agree with plaintiff's argument that the lens serves a "subsidiary purpose" because the machine would be inoperative if there were a failure of the conveying, spinning, or rejection features. Doubtlessly, even a disruption of electrical power could incapacitate the entire machine, but that fact hardly demonstrates that any particular component serves a subsidiary purpose.[8]

I find equally untenable plaintiff's argument that the Rota's lens serves a subsidiary purpose since ampul inspection may be accomplished manually without an optical instrument, or by an electronic machine utilizing a television camera rather than human vision. The plain fact remains that it is the Rota that is before the court for classification, and it is undisputed that the mechanical method of optical inspection employed by the Rota necessitates the use of the magnifying lens.

In sum, the arguments advanced by plaintiff have failed to establish satisfactorily that the rationale of *Ataka* is inapplicable here, or that the *Amaco* decision should not be followed. Consequently, I find that plaintiff has failed to overcome the presumption that the magnifying lens of the Rota does not serve a "subsidiary purpose", and that the Rotas are "optical instruments" as defined in headnote 3.[9] Inasmuch as our Appellate Court has determined that the Rota performs a "checking" function within the purview of the superior heading to item 710.90, TSUS, I must ineluctably conclude that the merchandise

---

[8] Plaintiff's argument is analogous to saying that an engine or transmission serves a subsidiary purpose in an automobile because the automobile would be inoperative if the battery failed.

[9] Defendant argues that the Rota's polarizing screen, as well as its lens, constitutes the Rota an optical instrument. However, the Court of Customs and Patent Appeals remanded this case with reference to the function of the lens only. In any event, in view of the conclusion reached, it is unnecessary to address defendant's argument respecting the polarizing screen, since under headnote 3, one nonsubsidiary optical element is sufficient to classify an article as an optical instrument.

was properly classified by the regional commissioner of customs under item 710.90, TSUS. This action, therefore, is dismissed.

Judgment will be entered accordingly.